FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

2013 MAR 14  P 4: 01

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| THE FEDERAL HOME LOAN MORTGAGE CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; BARCLAYS BANK PLC; BRITISH BANKERS' ASSOCIATION; BBA ENTERPRISES, LTD; BBA LIBOR, LTD; CITIGROUP, INC.; CITIBANK, N.A.; COOPERATIVE CENTRALE RAIFFEISEN-BOERENLEENBANK, B.A.; CREDIT SUISSE GROUP AG; CREDIT SUISSE INTERNATIONAL; DEUTSCHE BANK AG; HSBC HOLDINGS PLC; HSBC BANK USA, N.A.; J.P. MORGAN CHASE & CO.; J.P. MORGAN CHASE BANK, N.A.; LLOYDS BANKING GROUP, PLC; HBOS PLC; THE NORINCHUKIN BANK; ROYAL BANK OF CANADA; THE ROYAL BANK OF SCOTLAND GROUP PLC; THE ROYAL BANK OF SCOTLAND PLC; THE BANK OF TOKYO-MITSUBISHI UFJ, LTD; UBS AG; WESTLB AG; and PORTIGON AG,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**COMPLAINT**   1: 13 CV 342
                    TSE/JDD
**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

Page

NATURE OF THE CASE ........................................................................................... 1

JURISDICTION AND VENUE ................................................................................. 3

PARTIES ...................................................................................................................... 5

BACKGROUND ......................................................................................................... 13

I.     LIBOR ............................................................................................................. 13

       A.     Calculation of LIBOR ......................................................................... 13

       B.     LIBOR Governance ............................................................................. 16

       C.     Defendants' Knowledge of LIBOR's Importance ............................. 18

FRAUDULENT AND COLLUSIVE CONDUCT RELATING TO LIBOR ............. 20

II.    CONDUCT TO BENEFIT INDIVIDUAL TRADER POSITIONS ................. 20

III.   SYSTEMATIC LIBOR SUPPRESSION ........................................................ 21

IV.    HARMFUL EFFECTS OF THE UNLAWFUL CONDUCT ........................... 33

DISCLOSURE OF THE FRAUDULENT AND COLLUSIVE CONDUCT ............. 36

       A.     Barclays Admissions ............................................................................ 38

       B.     UBS Admissions .................................................................................. 39

       C.     RBS Admissions .................................................................................. 41

COUNT I:  VIOLATIONS OF SHERMAN ACT SECTION 1 (ALL DEFENDANTS) ........... 44

COUNT II:  BREACH OF CONTRACT (DEFENDANT BANK OF AMERICA) .................. 47

COUNT III:  BREACH OF CONTRACT (DEFENDANT BARCLAYS) ................................ 49

COUNT IV:  BREACH OF CONTRACT (DEFENDANT CITIBANK, N.A.) ......................... 50

COUNT V:  BREACH OF CONTRACT (DEFENDANT CREDIT SUISSE) .......................... 52

COUNT VI:  BREACH OF CONTRACT (DEFENDANT DEUTSCHE BANK) .................... 53

COUNT VII:  BREACH OF CONTRACT (DEFENDANT HSBC) ......................................... 55

COUNT VIII:  BREACH OF CONTRACT (DEFENDANT RBS) ........................................... 57

COUNT IX:  BREACH OF CONTRACT (DEFENDANT UBS) ............................................ 58

COUNT X:  FRAUD (ALL DEFENDANTS) .......................................................................... 60

COUNT XI:  TORTIOUS INTERFERENCE WITH CONTRACT (ALL DEFENDANTS) ..... 62

PRAYER FOR RELIEF ............................................................................................. 63

JURY DEMAND ........................................................................................................ 63

## NATURE OF THE CASE

1.     This Complaint arises from what has been characterized as the most costly commercial banking scandal in history.[1]  Over a period of years, Defendants collectively manipulated and suppressed the London Interbank Offered Rate ("LIBOR"), a benchmark rate indexed to trillions of dollars in interest-rate swaps and loans that plays a fundamentally important role in financial systems throughout the world.  Defendants touted LIBOR as a "simple, transparent benchmark . . . [that is] a reliable indicator of the state of the money markets, and one of the most reliable barometers of risk in the global economy,"[2] promoted LIBOR as the "world's most important number,"[3] and claimed that they determined LIBOR through an honest assessment of their respective credit risks.  In truth, however, Defendants on the LIBOR panel ("Panel Bank Defendants") acted collectively to suppress U.S. Dollar ("USD") LIBOR, both to hide their institutions' financial problems and to boost their profits.  The Panel Bank Defendants engaged in this fraudulent and collusive conduct on a daily basis from August 2007 through at least May 2010.

2.     On information and belief, Defendant British Bankers' Association ("BBA") participated in this scheme to protect the revenue stream it generated from selling LIBOR licenses and to appease the Panel Bank Defendants, which wanted to maintain control of LIBOR. While several Defendants have admitted the fact of this unlawful conduct, most of the facts

---

[1] *The Worst Banking Scandal Yet?*, Bloomberg, July 12, 2012,
http://www.bloomberg.com/news/2012-07-12/the-worst-banking-scandal-yet-.html.

[2] British Bankers' Association Annual Report 2010, *available at*
www.bba.org.uk/download/6814.

[3] BBA, *BBA LIBOR: The World's Most Important Number Now Tweets Daily*, May 21, 2009,
http://www.bbalibor.com/news-releases/bba-libor-the-worlds-most-important-number-now-tweets-daily.

remain known only to Defendants and the regulatory agencies investigating LIBOR. Investigators are still piecing together what one publication called a "breathtaking portrait of avarice and deceit."[4]  Former Chairman of the United States Federal Reserve, Alan Greenspan, was recently quoted as saying: "Through all of my experience, what I never contemplated was that there were bankers who would purposely misrepresent facts to banking authorities. You were honor bound to report accurately, and it never entered my mind that, aside from a fringe element, it would be otherwise."[5]

      3.    Plaintiff, The Federal Home Loan Mortgage Corporation ("Freddie Mac"), is a government-sponsored enterprise ("GSE") chartered by Congress with a public mission to provide liquidity, stability, and affordability to the United States housing market. Freddie Mac serves the secondary mortgage market by providing a stable supply of money for lenders, which lowers mortgage interest rates for millions of consumers. Freddie Mac plays a vital role in the United States economy by moderating cyclical swings in the housing sector, equalizing the flow of mortgage funds regionally throughout the United States, and ensuring the availability of mortgage funds in a variety of economic conditions. Freddie Mac increases opportunities for affordable home ownership and rental housing for low- and moderate-income families across the nation.

      4.    Throughout the 2000s, Freddie Mac generated income through investment activities. Freddie Mac purchased financial products tied to USD LIBOR and sought to generate attractive returns through a disciplined approach to interest rate risk and capital management.

---

[4] *The Worst Banking Scandal Yet?*, *supra* note 1.

[5] Liam Vaughan & Gavin Finch, *Libor Lies Revealed in Rigging of $300 Trillion Benchmark*, Bloomberg, Jan. 28, 2013, http://www.bloomberg.com/news/2013-01-28/libor-lies-revealed-in-rigging-of-300-trillion-benchmark.html.

Freddie Mac used derivative financial instruments to balance its funding mix, as well as to economically hedge forecasted issuance of debt and foreign-currency exposure. As Defendants were aware, Freddie Mac is among the largest purchasers of mortgages and mortgage-backed securities ("MBSs") in the United States and engages in interest rate transactions with billions of dollars in notional value every year. Freddie Mac reasonably relied on Defendants' misrepresentations in entering into financial transactions tied to USD LIBOR.

5.      Defendants' unlawful conduct as described in this Complaint caused substantial losses to Freddie Mac. For example, in 2008 alone, Freddie Mac entered into hundreds of pay-fixed, receive-floating interest rate swap transactions ("pay-fixed swaps") indexed to USD LIBOR with billions of dollars in notional value. Similarly, Freddie Mac purchased billions of dollars worth of MBSs in which coupon payments, or the underlying collateral, were indexed to USD LIBOR. Freddie Mac, by and through its attorneys, Dickstein Shapiro LLP, seeks to recover for the losses it sustained as a result of this unlawful conduct.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26), as well as 28 U.S.C. §§ 1331 and 1337. This Court also has subject matter jurisdiction under 12 U.S.C. § 1452(f), which grants district courts of the United States original jurisdiction over all civil cases where Freddie Mac is a party. In addition, the EDGE Act, 12 U.S.C. § 632, provides federal jurisdiction because Freddie Mac and several Defendants are organized under the laws of the United States and this case arises out of "transactions involving international or foreign banking" and/or "other international or foreign financial operations."

7.     This Court has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1367 because all of the claims arise from the same facts and circumstances and form part of the same case or controversy.

8.     This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and Sections 1 and 4 of the Virginia Long-Arm Statute (Va. Code. Ann. § 8.01-328.1).  As discussed more fully below, Defendants conspired to artificially suppress LIBOR, which caused harm within the United States, and specifically within the Eastern District of Virginia, Freddie Mac's principal place of business.  Defendants are sophisticated market participants that knew, or reasonably should have known, that their fraudulent and collusive suppression of USD LIBOR would produce substantial and foreseeable effects in the United States and in this District.  As described below, in furtherance of the conspiracy alleged in this Complaint, certain Defendants entered into contracts with Freddie Mac in the Eastern District of Virginia and made payments to Freddie Mac in the Eastern District of Virginia that were determined by the fraudulent USD LIBOR rates and therefore well below (by hundreds of millions or billions of dollars) the payments that would have been made in the absence of the fraud and conspiracy.  Because of Freddie Mac's size and importance, Defendants knew or should have known of these contracts and payments to Freddie Mac.  Defendants therefore purposefully availed themselves of the privilege of conducting activities in the United States, and the Eastern District of Virginia, in connection with the unlawful activities described in this Complaint.

9.     Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15, 22) and 28 U.S.C. § 1391.  Several Defendants maintain offices or agents, transact business, or are found within the Eastern District of Virginia.  A substantial part of the

interstate commerce giving rise to the claims described in this Complaint was carried out, in part, within the Eastern District of Virginia. Defendants performed acts in furtherance of their conspiracy within the Eastern District of Virginia and elsewhere that were intended to affect, and did affect, Freddie Mac and others located within the Eastern District of Virginia.

## PARTIES

10.     Freddie Mac is a GSE located at 8200 Jones Branch Drive in McLean, Virginia.

11.     Defendant Bank of America Corporation ("Bank of America") is a Delaware corporation headquartered in Charlotte, North Carolina. Bank of America was at all relevant times a member of the BBA's USD LIBOR panel of banks. Several subsidiaries of Bank of America engaged in financial transactions relating to USD LIBOR with Freddie Mac in Virginia, including Defendant Bank of America, N.A. (the successor-in-interest to NationsBank, N.A.), a Delaware corporation headquartered in Charlotte, North Carolina, which engaged in pay-fixed swaps with Freddie Mac. On information and belief, Bank of America participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

12.     Defendant Barclays Bank plc ("Barclays") is a United Kingdom public limited company headquartered in London, England. Barclays was at all relevant times a member of the USD LIBOR panel of banks. Barclays operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[6] Barclays engaged in financial transactions relating to USD LIBOR with Freddie Mac in the Eastern

---

[6] Barclays, *Barclays in the United States*, http://group.barclays.com/about-barclays/about-us/usa (last visited Feb. 25, 2013).

District of Virginia. On information and belief, Barclays participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

13.     The BBA is a trade association based in the United Kingdom. Throughout the 2000s, the BBA owned LIBOR. The BBA is governed by a Board, which officially meets four times per year, comprised of the BBA Chief Executive and Chief Executives of several Defendants. Defendant BBA Enterprises, Ltd. is a wholly owned subsidiary of the BBA located in London. In late 2009, the BBA incorporated a new legal subsidiary, Defendant BBA LIBOR, Ltd. to house LIBOR. One published report has stated that the BBA created BBA LIBOR, Ltd. to help shield the BBA from potential liability arising from the facts forming the basis of this Complaint.[7]

14.     As set forth more fully below, the BBA advertised LIBOR in the United States and the Eastern District of Virginia and solicited business in the United States. In 2007, the BBA sought and obtained a trademark for bbaLIBOR™ from the United States Patent and Trademark Office, located at 600 Dulany Street, Alexandria, Virginia (Registration No. 3212218). The BBA electronically communicated news and information through Internet websites (bba.org, bbalibor.org), the Thomson Reuters website (reuters.com), the *Wall Street Journal*, and through other data vendor websites including International Data Corp. ("IDC"), which maintains an office in Alexandria, Virginia.[8] The BBA published LIBOR data to more than a million computer screens around the world, including in the United States and, on

---

[7] David Enrich & Max Colchester, *Before Scandal, Clash over Control of Libor*, Wall St. J., Sept. 11, 2012,
http://online.wsj.com/article/SB10000872396390443847404577631404235329424.html.

[8] BBA, *Welcome to bbalibor, Frequently Asked Questions (FAQs)*,
http://www.bbalibor.com/bbalibor-explained/faqs (last visited Feb. 25, 2013); IDC Worldwide Offices, http://www.idc.com/about/wwoffices.jsp#.UTkzDo6BBMY.

information and belief, the Eastern District of Virginia.[9] In 2009, the BBA launched a Twitter social media service news feed to bypass the print media[10] and because interest in LIBOR had soared "since so many loans are linked to it."[11] The BBA also maintains a Facebook page accessible from the Eastern District of Virginia (https://www.facebook.com/BritishBankers).

15.    Defendant Citigroup Inc. ("Citigroup") is a Delaware corporation headquartered in New York, New York. Citigroup or its wholly owned subsidiary, Defendant Citibank, N.A., which is headquartered in New York, New York, was at all relevant times a member of the USD LIBOR panel of banks. Several wholly owned subsidiaries of Citigroup engaged in financial transactions relating to LIBOR with Freddie Mac in the Eastern District of Virginia, including Defendant Citibank, N.A. On information and belief, Citigroup participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

16.    Defendant Coöperative Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank") is a financial services provider with its headquarters in Utrecht, the Netherlands. Rabobank was at all relevant times a member of the USD LIBOR panel of banks. Rabobank operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[12] On information and belief, Rabobank participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

---

[9] BBA, *Welcome to bbalibor, Frequently Asked Questions (FAQs)*, *supra* note 8.

[10] BBA, *Capital Markets Bulletin*, at 5 (June 2, 2009), *available for download at* http://www.bba.org.uk/policy/article/Capital-Markets-Bulletin-June-09/capital-markets-bulletin/.

[11] BBA, *The World's Most Important Number Now Tweets Daily*, *supra* note 3.

[12] Rabobank Group, *Are We Somewhere Near You?*, https://www.rabobank.com/en/locateus/index.html (last visited Mar. 7, 2013).

17.     Defendant Credit Suisse Group AG ("Credit Suisse") is a Swiss company headquartered in Zurich, Switzerland.  Credit Suisse was at all relevant times a member of the USD LIBOR panel of banks.  Several subsidiaries of Credit Suisse engaged in financial transactions relating to USD LIBOR with Freddie Mac in the Eastern District of Virginia, including Defendant Credit Suisse International (f/k/a Credit Suisse First Boston International). Credit Suisse operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[13]  On information and belief, Credit Suisse participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

18.     Defendant Deutsche Bank AG ("Deutsche Bank") is a German financial services company headquartered in Frankfurt, Germany.  Deutsche Bank was at all relevant times a member of the USD LIBOR panel of banks.  Several subsidiaries of Deutsche Bank engaged in financial transactions relating to USD LIBOR with Freddie Mac in the Eastern District of Virginia.  Deutsche Bank operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[14]  On information and belief, Deutsche Bank participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

19.     Defendant HSBC Holdings plc ("HSBC") is a United Kingdom public limited company headquartered in London, England.  HSBC was at all relevant times a member of the USD LIBOR panel of banks.  Several subsidiaries of HSBC engaged in financial transactions

---

[13] Credit Suisse, *Office Locator*, https://www.credit-suisse.com/who_we_are/en/office_locator.jsp (last visited Mar. 7, 2013).

[14] Deutsche Bank, *Welcome to Deutsche Bank USA*, https://www.db.com/us/ (locations) (last visited Mar. 7, 2013).

relating to USD LIBOR with Freddie Mac in Virginia, including Defendant HSBC Bank USA, N.A, a national banking association with its main office in McLean, Virginia.[15] HSBC operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[16] On information and belief, HSBC participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

20.     Defendant J.P. Morgan Chase & Co. ("J.P. Morgan") is a Delaware corporation headquartered in New York, New York. J.P. Morgan was at all relevant times a member of the USD LIBOR panel of banks. J.P. Morgan wholly owns Defendant J.P. Morgan Chase Bank, N.A., a national banking association principally located in Columbus, Ohio. Several wholly owned subsidiaries of J.P. Morgan engaged in financial transactions relating to USD LIBOR with Freddie Mac in the Eastern District of Virginia. On information and belief, J.P. Morgan participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

21.     Defendant Lloyds Banking Group plc ("Lloyds") is a United Kingdom public limited company headquartered in London, England. Lloyds was formed in 2009 through the acquisition of Defendant HBOS plc ("HBOS") by Lloyds TSB Bank plc. Prior to 2009, HBOS and Lloyds TSB Bank plc were members of the USD LIBOR panel of banks. Lloyds joined the USD LIBOR panel of banks upon its formation in 2009. Lloyds operated directly, or through its

---

[15] HSBC Bank USA, National Association, Fact Sheet,
http://www.us.hsbc.com/1/PA_1_083Q9FJ08A002FBP5S00000000/content/new_usshared/share
d_fragments/pdf/hbus_factsheet_0912.pdf.

[16] HSBC, *Customer Service: Find HSBC Branches and ATMs*,
http://www.us.hsbc.com/1/2/home/customer-service/hsbc-locations/branch (last visited Mar. 7, 2013).

wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[17] On information and belief, Lloyds participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

22.     Defendant The Norinchukin Bank ("Norinchukin") is a Japanese cooperative bank headquartered in Tokyo, Japan. Norinchukin was at all relevant times a member of the USD LIBOR panel of banks. Norinchukin maintains a branch office in New York, New York.[18] Norinchukin is one of Japan's largest institutional investors and has a reputation as Japan's largest hedge fund. Norinchukin operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States. On information and belief, Norinchukin participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

23.     Defendant Royal Bank of Canada ("RBC") is the largest financial institution in Canada and is headquartered in Toronto, Canada. RBC was at all relevant times a member of the USD LIBOR panel of banks. RBC operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[19] On information and belief, RBC participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

---

[17] Lloyds Banking Group, *Life with Us: Locations – International locations,* http://www.lloydsbankinggroup-careers.com/view/213/international-locations.html (last visited Mar. 7, 2013).

[18] Norinchukin Bank, *About The Norinchukin Bank,* http://www.nochubank.or.jp/en/about/globalnetwork.html (last visited Feb. 25, 2013).

[19] RBC Bank, *About RBC Bank,* http://www.rbcbank.com/about-us/cid-296623.html (last visited Mar. 12, 2013).

24.     Defendant The Royal Bank of Scotland Group, plc ("RBS") is a United Kingdom public limited company headquartered in Edinburgh, Scotland.  RBS was at all relevant times a member of the USD LIBOR panel of banks.  Several subsidiaries of RBS engaged in financial transactions relating to USD LIBOR with Freddie Mac in the Eastern District of Virginia, including Defendant The Royal Bank of Scotland plc.  RBS operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[20]  On information and belief, RBS participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

25.     Defendant The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU") is a Japanese subsidiary of Mitsubishi UFJ Financial Group, Inc. and is headquartered in Tokyo, Japan.  BTMU was at all relevant times a member of the USD LIBOR panel of banks.  BTMU operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[21]  On information and belief, BTMU participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

26.     Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland.  UBS was at all relevant times a member of the USD LIBOR panel of banks.  UBS was formed in 1998 through the merger of Swiss Bank Corporation and the Union Bank of Switzerland.  Several subsidiaries of UBS engaged in financial transactions relating to USD LIBOR with Freddie Mac in the Eastern District of Virginia.  UBS operated directly, or through

---

[20] RBS Group, *About Us: Worldwide Locations*,
http://www.rbs.com/content/rbs/en/about/locations.html (last visited Mar. 7, 2013).

[21] Bank of Tokyo-Mitsubishi UFJ, *Our Company – The Americas*,
http://www.bk.mufg.jp/english/ourcompany/globalnetwork/americas.html#USA (last visited Feb. 25, 2013).

its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[22] On information and belief, UBS participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

27.     Defendant WestLB AG is a German joint stock company headquartered in Dusseldorf, Germany. Defendant Portigon AG is a German company headquartered in Dusseldorf, Germany that acquired WestLB AG in 2009. Prior to 2009, WestLB AG was a member of the USD LIBOR panel of banks. Portigon joined the USD LIBOR panel of banks after acquiring WestLB AG. This Complaint refers to WestLB AG and Portigon AG, collectively, as "WestLB." WestLB operated directly, or through its wholly owned and/or controlled subsidiaries, affiliates, agents, and predecessors, in the United States.[23] On information and belief, WestLB participated in the unlawful conduct alleged in this Complaint both directly and through its subsidiaries and affiliates.

28.     The acts charged in this Complaint as having been done by Defendants were authorized, ordered, or done by their officers, directors, agents, employees, or representatives, while actively engaged in the management of Defendants' businesses or affairs.

29.     Various other individuals, companies, corporations, partnerships, associations, and other entities, the identities of which are unknown to Freddie Mac and which cannot responsibly be named as Defendants in this action, may have participated as co-conspirators with

---

[22] UBS, UBS Location Finder, http://apps1.ubs.com/locationfinder/searchForm.do?GeoEntityId=3&GeoEntityType=3 (last visited Feb. 25, 2013).

[23] Portigon Financial Services, *Our Locations*, http://www.portigon.com/cm/content/portigon/i/en/ueber-portigon/konzerninformationen/standorte.html (last visited Feb. 25, 2013).

Defendants in the violations alleged in this Complaint, and/or performed substantial acts and made statements in the Eastern District of Virginia in furtherance of the alleged violations.

30.     At all relevant times, Defendants were acting as the agents, employees, co-conspirators, and/or representatives of each other, and were acting within the course and scope of their agency, employment, and/or conspiracy with the full knowledge, consent, permission, authorization, and ratification, either express or implied, of each of the other Defendants in performing the acts alleged in this Complaint.

## BACKGROUND

### I.     LIBOR

31.     The BBA created LIBOR in 1986 as a tool to help its members set interest rates on large corporate loans issued collectively by multiple banks.  Over time, LIBOR increased in importance as banks began incorporating it into financial contracts.  Based on its asserted "objectivity and accuracy," LIBOR developed into the primary benchmark for short-term interest rates globally and is now indexed to trillions of dollars worth of financial instruments, including interest rate contracts and mortgages.[24]  Financial institutions around the world, including Freddie Mac, reasonably relied on LIBOR as an honest and accurate benchmark.

### A.     Calculation of LIBOR

32.     During the 2000s, the BBA licensed LIBOR for 15 maturities, from overnight to 12 months, and for 10 currencies (Australian Dollar, Canadian Dollar, Swiss Franc, Danish

---

[24] BBA, *Welcome to bbalibor, The Basics*, http://www.bbalibor.com/bbalibor-explained/the-basics (last visited Feb. 25, 2013); BBA, *Understanding The Construction And Operation Of LIBOR – Strengthening For The Future* (June 10, 2008), *available at* http://www.aciforex.org/docs/markettopics/20080610__BBA_comments_on_Libor_fixing.pdf.

Krone, Euro, Sterling, Japanese Yen, New Zealand Dollar, Swedish Krona and USD). The BBA's licensees included companies located in the United States.

33.     The BBA calculated LIBOR from submissions made by a panel of banks selected for each currency ("Contributor Banks"). The BBA published rules governing the way that the Contributor Banks determined their submissions and the Contributor Banks agreed to abide by those rules to remain on the LIBOR panel of banks. The BBA's rules stated that Contributor Banks must provide rates for each tenor which answer the question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 am?" The 16 Contributor Banks on the USD LIBOR Panel ("Panel Bank Defendants") claimed that they abided by the BBA's published rules and definitions and based their submissions on their cost of funds in the London interbank market without reference to rates submitted by other Contributor Banks or the pricing of any derivative financial instrument.[25] The BBA claimed that the Contributor Banks were chosen based on their scale of market activity, credit rating, and perceived expertise in the currency concerned.[26]

34.     Contributor Banks electronically communicated their LIBOR submissions every London business day to the BBA's agent, Thomson Reuters, by 11:10 a.m. London Time. The BBA's published rules stated that Contributor Banks were not to know the LIBOR rates submitted by other Contributor Banks during this submission window.[27]

---

[25] Letter from Denis J. McInerney, Chief, Fraud Section, Criminal Division, United States Department of Justice, Appendix A (Dec. 18, 2012) ("UBS SOF") ¶ 7, attached as Exhibit 1 and incorporated into this Complaint by reference; BBA, *Welcome to bbalibor, The Basics*, *supra* note 24; BBA, *Welcome to bbalibor, Setting bbalibor*, http://www.bbalibor.com/technical-aspects/setting-bbalibor (last visited Feb. 25, 2013); BBA, *Welcome to bbalibor, Definitions*, http://www.bbalibor.com/bbalibor-explained/definitions (last visited Feb. 25, 2013).

[26] BBA, *Welcome to bbalibor, The Basics*, *supra* note 24.

[27] *Id.*

35.    USD LIBOR was calculated by throwing out the four highest and four lowest submissions, and then averaging the remaining eight submissions for each tenor.  This average constituted the LIBOR "fixing."[28]  Thomson Reuters, as an agent for the BBA, then electronically communicated the LIBOR fixings to licensees, including the *Wall Street Journal*, and *Bloomberg News* by midday, London Time.[29]  The *Wall Street Journal* and *Bloomberg News* published LIBOR 24 hours after the BBA published it to its licensees.  The individual LIBOR submissions for each Panel Bank Defendant were also transmitted through the BBA's licensed data vendors.  Figure 1 below presents the BBA's graphic depiction of the LIBOR process.[30]

**Figure 1:  LIBOR Processes**



---

[28] In the parlance of commercial banks, a rate submission for LIBOR was referred to as a "submission" and the LIBOR rate that the BBA publishes was known as the "fixing."

[29] BBA, *Welcome to bbalibor, Frequently Asked Questions (FAQs)*, *supra* note 8.

[30] BBA, *Welcome to bbalibor, The Basics*, *supra* note 24.

### B.   LIBOR Governance

36.    Through 2010, the Foreign Exchange and Money Markets ("FX & MM") Committee of the BBA had sole responsibility for all aspects of the functioning and development of LIBOR.[31]  Thirteen "active market practitioners" comprised the FX & MM Committee.[32]  The BBA does not disclose the names of the members of the FX & MM Committee,[33] but UBS and RBS admit that they had representatives on the FX & MM Committee.[34]  On information and belief, other Panel Bank Defendants also served on the FX & MM Committee.  The chair and two deputy chairs of the FX & MM Committee were representatives from the Contributor Banks.[35]  FX & MM Committee members met at least every two months at undisclosed locations to discuss LIBOR.[36]  The FX & MM Committee did not publish official minutes.[37]  UBS'

---

[31] *See, e.g.,* Landon Thomas Jr., *Trade Group for Bankers Regulates a Key Rate*, N.Y. Times, July 5, 2012, http://www.nytimes.com/2012/07/06/business/global/the-gentlemens-club-that-sets-libor-is-called-into-question.html?pagewanted=all; Some Preliminary Findings, Second Report of Session 2012-13, Vol. I, at 5 (Aug. 18, 2012) ("Wheatley Report I"), available at http://www.parliament.uk/documents/commons-committees/treasury/Fixing%20LIBOR_%20some%20preliminary%20findings%20-%20VOL%20I.pdf..

[32] BBA, *Understanding BBA LIBOR*, www.bba.org.ug/media/article/understanding-bba-libor (last visited Mar. 7, 2013).

[33] Enrich & Colchester, *Before Scandal, Clash over Control of Libor*, *supra* note 7.

[34] UBS SOF ¶ 85; Financial Services Authority, Final Notice to UBS AG ¶ 89 (Dec. 19, 2012) ("UBS Final Notice"), attached as Exhibit 2 and incorporated into this Complaint by reference; Financial Services Authority, Final Notice to the Royal Bank of Scotland ¶ 89 (Feb. 6, 2013), attached as Exhibit 3 and incorporated into this Complaint by reference.

[35] BBA, *LIBOR Governance and Scrutiny: Proposals Agreed by the FX & MM Committee* § 2.3 (Nov. 17, 2008), *available at* www.bba.org.uk/download/7516.

[36] Liam Vaughan, *Secret Libor Committee Clings to Anonymity Following Scandal*, Bloomberg, Aug. 21, 2012, http://www.bloomberg.com/news/2012-08-20/secret-libor-committee-clings-to-anonymity-after-rigging-scandal.html.

[37] *Id.*

representative on the FX & MM Committee in 2009 knew of fraudulent and collusive conduct relating to LIBOR and directed employees to "be careful" not to expose the unlawful conduct.[38]

37.     The BBA employed a full-time manager to supervise on a day-to-day basis all aspects of LIBOR calculation and dissemination to the marketplace.  The LIBOR manager was purportedly responsible for ensuring that all LIBOR processes operated to the highest standards. The LIBOR manager acted as secretariat to the FX & MM Committee and was responsible for informing the FX & MM Committee about issues pertaining to LIBOR.

38.     In April 2005, the BBA hired John Ewan, a 29-year-old financial researcher with a biology degree, to serve as the LIBOR manager and to put LIBOR on secure commercial footing.[39]  Mr. Ewan, dubbed by one publication as "Mr. LIBOR," has claimed that during his tenure he increased revenue from LIBOR more than tenfold, introduced new products, and obtained European Union, United States and Japanese trademarks for LIBOR.[40]  Mr. Ewan claims that he was responsible for developing and maintaining relationships with all stakeholders in LIBOR, keeping them apprised of changes to the benchmark and the markets it tracks.[41] Mr. Ewan also claims to have cultivated "excellent relationships at a senior level" with most

---

[38] UBS SOF ¶¶ 85-86.

[39] John Ewan, LinkedIn profile, http://www.linkedin.com/profile/view?id=16112767&authType=NAME_SEARCH&authToken =wls3&locale=en_US&srchid=9e589557-4afa-4690-a3a2-1fa98b5f7578- 0&srchindex=2&srchtotal=14&goback=.fps_PBCK_*1_John_Ewan_*1_*1_*1_*1_*2_*1_Y_* 1_*1_*1_false_1_R_*1_*51_*1_*51_true_*2_*2_*2_*2_*2_*2_*2_*2_*2_*2_*2_*2_ *2_*2_*2_*2_*2_*2_*2&pvs=ps&trk=pp_profile_name_link (last visited February 25, 2013). Mr. Ewan left the BBA in the summer of 2012.

[40] Steve Hawkes, *Mr. Libor Quits*, The Sun, July 21, 2012. http://www.thesun.co.uk/sol/homepage/news/money/4441913/Mr-Libor-quits.html.

[41] John Ewan, LinkedIn profile, *supra* note 40.

major central banks and market participants (principally banks, brokers, trade associations, hedge funds, and exchanges).[42]

39.    On January 1, 2010, more than a year after learning that regulators were investigating LIBOR, the BBA modified its structure. It created a new entity, BBA LIBOR, Ltd., to assume responsibility for the day-to-day running of the benchmark. As noted above, one report suggested that the BBA created BBA LIBOR, Ltd. to limit the BBA's liability in the expectation of claims relating to LIBOR. The FX & MM Committee continued to oversee LIBOR. Despite this change in structure, the processes and procedures followed by the Contributor Banks and the BBA in calculating and publishing LIBOR remained the same. On September 12, 2012, an independent panel recommended that the BBA be stripped of its role in LIBOR rate setting. Martin Wheatley, head of the United Kingdom's Financial Services Authority ("FSA"), noted at the time, "the BBA acts as the lobby organisation for the same submitting banks that they nominally oversee, creating a conflict of interest that precludes strong and credible governance."[43] In February 2013, the BBA agreed to cede control of LIBOR to a new operator.

C.    **Defendants' Knowledge of LIBOR's Importance**

40.    As evidenced by the following quote from the BBA, Defendants understood the importance of LIBOR to the economy and actively promoted LIBOR as a key benchmark rate.

> BBA LIBOR is by far the most widely referenced interest rate index in the world. Its importance goes beyond that of inter bank lending and touches everyone from large international conglomerates

---

[42] *Id.*

[43] *The Wheatley Review of LIBOR: Final Report*, at 21 (Sept. 12. 2012), available at http://cdn.hm-treasury.gov.uk/wheatley_review_libor_finalreport_280912.pdf.

to small borrowers. It is central in interest rate swaps and the great majority of floating rate securities and loans relate to LIBOR. Independent research indicates that around $350 trillion of swaps and $10 trillion of loans are indexed to BBA LIBOR. It is the basis for settlement of interest rate contracts on the world's major futures and options exchanges. It is written into standard derivative and loan documentation such as the ISDA terms and is also used for an increasing range of retail products.[44]

41.    Market participants, including Freddie Mac, reasonably relied on Defendants' representations that LIBOR was honestly set and that the Panel Bank Defendants submitted LIBOR rates that were accurate and consistent with the published LIBOR rules. Indeed, the BBA acknowledged in 2008 that LIBOR "has always been relied on by the market as a reliable benchmark."[45]

42.    LIBOR submissions contained market information concerning the costs of borrowing unsecured funds in particular currencies and tenors, the liquidity conditions and stress in the money markets, and the Contributor Banks' ability to borrow funds in the particular markets.[46] Such market information affected, or tended to affect, the prices of commodities in interstate commerce, including the daily rates at which LIBOR was fixed and the financial products that expressly incorporated LIBOR.[47]

---

[44] BBA, *Understanding the Construction and Operation of LIBOR – Strengthening For The Future*, § 1.1, *supra* note 24.

[45] BBA, *Libor Gets Enhanced Governance and Scrutiny Procedures* (Dec. 18, 2008), http://www.bbalibor.com/ news-releases/libor-gets-enhanced-governance-and-scrutiny-procedures (last visited Mar. 10, 2013).

[46] *In the Matter of: Barclays PLC, Barclays Bank PLC, and Barclays Capital, Inc.*, CFTC Docket No. 12-25, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions (June 27, 2012) ("Barclays CFTC Order"), at 26, attached as Exhibit 4 and incorporated into this Complaint by reference.

[47] *Id.*

43. Because a Contributor Bank's LIBOR submissions should correspond to the cost at which the Contributor Bank concludes that it can borrow funds, a Contributor Bank's LIBOR submission may be perceived as an indicator of the Contributor Bank's financial health and liquidity. For example, if a Contributor Bank's LIBOR submission is relatively high as compared to other Contributor Banks, that submission could suggest that the Contributor Bank is paying a relatively high amount to borrow funds and therefore could be perceived as having financial difficulties. In addition, higher LIBOR submissions could signal that a Contributor Bank is willing to pay higher amounts for funds, indicating potential liquidity problems. Commercial banks with liquidity problems have trouble attracting business and could find themselves prohibited from working with companies like Freddie Mac.

## FRAUDULENT AND COLLUSIVE CONDUCT RELATING TO LIBOR

## II. CONDUCT TO BENEFIT INDIVIDUAL TRADER POSITIONS

44. Recent public disclosures reveal that certain derivatives traders employed by the Panel Bank Defendants routinely asked their LIBOR submitters to provide false and dishonest LIBOR submissions to the BBA.[48] The LIBOR submitters for these Panel Bank Defendants agreed to accommodate, and did accommodate, the traders' requests for favorable LIBOR submissions on hundreds, and perhaps thousands, of occasions.[49]

45. As described more fully in documents disclosed by the United States Department of Justice ("DOJ"), FSA, and other regulatory agencies, employees from, at least,

---

[48] UBS SOF ¶ 20; Letter from Denis J. McInerney, Chief, Criminal Division, Fraud Section, United States Department of Justice, Appendix A (June 26, 2012) ("Barclays SOF") ¶ 11, attached as Exhibit 5 and incorporated into this Complaint by reference; *United States v. Royal Bank of Scotland plc,* Deferred Prosecution Agreement, Attachment A (Feb. 5, 2013) ("RBS SOF"), ¶ 14, attached as Exhibit 6 and incorporated into this Complaint by reference.

[49] Barclays SOF ¶ 11; UBS SOF ¶ 20; RBS SOF ¶¶ 14-15, 19.

Barclays, UBS, and RBS used several principal and interrelated methods to effectuate their fraudulent and collusive scheme, including: (a) internal manipulation of LIBOR submissions; (b) use of cash brokers to influence other Panel Bank Defendants' LIBOR submissions; and (c) direct collusion with employees at other Contributor Banks.[50]

46.     These traders effectuated their fraudulent and collusive conduct through electronic communications, telephone conversations, and in-person conversations.[51] Over a period of years, a culture of collusion developed that facilitated the ongoing and secret manipulation of LIBOR and, ultimately, enabled the systematic LIBOR suppression discussed below.[52] Through coordination with Panel Bank Defendants, these traders improved their efforts to fraudulently and collusively manipulate LIBOR.[53] Barclays, UBS, and RBS all admit that they submitted false and misleading LIBOR submissions to the BBA, and that the LIBOR fixings published by and through the BBA were materially false and misleading.[54]

## III.     SYSTEMATIC LIBOR SUPPRESSION

47.     In 2007, the United States economy endured a housing correction. At the time, a number of major financial institutions admitted that they owned large portfolios of financial products collateralized by subprime mortgages that may have lost their value. As a result of

---

[50] Barclays SOF ¶¶ 12, 28; UBS SOF ¶ 22; RBS SOF ¶ 18.

[51] Barclays SOF ¶ 11; UBS SOF ¶ 20; RBS SOF ¶ 15.

[52] *See, e.g.*, Bloomberg, *Libor Gives Prosecutors Chance to Change Banking Culture*, Sept. 24, 2012, http://www.bloomberg.com/news/2012-09-24/libor-gives-prosecutors-chance-to-change-banking-culture.html.

[53] Barclays SOF ¶¶ 23-24.

[54] Barclays SOF ¶ 33; RBS SOF ¶ 81; UBS SOF ¶ 97. On information and belief, other Panel Defendant Banks engaged in the same type of conduct that Barclays, UBS, and RBS have admitted occurred.

these events, the European Central Bank, United States Federal Reserve, the Bank of Canada, and the Bank of Japan all began to intervene on behalf of banks.

48.     On information and belief, many of the Panel Bank Defendants' portfolios in at least 2007 and 2008 were weighted such that the Panel Bank Defendants financially benefited from reductions in floating interest rates. For example, Deutsche Bank reportedly earned more than $650 million in profit during 2008 from trades tied to LIBOR because LIBOR was low.[55]

49.     On Thursday, August 9, 2007, the Panel Bank Defendants submitted overnight USD LIBOR rates that were significantly higher than the prior day. Overnight USD LIBOR rose from 5.35% on August 8, 2007, to 5.86% on August 9, 2007, which put USD LIBOR at its highest level since 2001. Because these increases were not coincidental with changes in the rates charged by central banks, the media expressed concern that the increase in USD LIBOR indicated that the Panel Bank Defendants were afraid to lend to each other and that major losses for Panel Bank Defendants and others were on the horizon.

50.     On August 9, 2007, after the LIBOR submissions were electronically published for that day, a UBS executive sent an internal email to a senior manager, a manager, and others stating that "it is highly advisable to err on the low side with fixings for the time being to protect our franchise in these sensitive markets. Fixing risk and [profit and loss] thereof is secondary priority for now."[56] UBS employees understood this secret directive to apply to all LIBOR currencies.[57]

---

[55] Jean Eaglesham, *Bank Made Huge Bet, and Profit, on Libor*, Wall St. J., Jan. 10, 2013, http://online.wsj.com/article/SB10001424127887324442304578231721272636626.html.

[56] UBS SOF ¶ 105.

[57] UBS SOF ¶ 108.

51.     By August 16, 2007, all of the Panel Bank Defendants dropped their submissions significantly.  UBS, for example, lowered its USD overnight LIBOR submission by 90 basis points.  Figure 2 below plots the USD overnight LIBOR submissions for the Panel Bank Defendants from August 7, 2007 through August 28, 2007.

**Figure 2: Overnight USD LIBOR Submissions**



52.     During this same time period, the BBA issued a press release titled "Key Facts about LIBOR" in which the BBA falsely stated that LIBOR "closely reflects the real rates of interest being used by the world's big financial institutions" and that it "reflects the actual rate at which banks borrow money from each other."[58]

---

[58] BBA, *Key Facts About BBA LIBOR* (Aug. 10, 2007),
http://www.bba.org.uk/customer/article/key-facts-about-bba-libor.

53.     On August 20, 2007, RBS' London-based head of money markets trading and the person responsible for USD LIBOR submissions, Paul Walker, reportedly telephoned RBS' head of short-term markets for Asia, Scott Nygaard, in Tokyo, to talk about how banks were using LIBOR to profit on its movements rather than submit rates that honestly reflected their perceived costs of borrowing. Mr. Walker is quoted as telling Mr. Nygaard: "People are setting to where it suits their book. . . . LIBOR is what you say it is."[59] Senior RBS managers reportedly knew, at least as of August 2007, that the Panel Bank Defendants were "systematically rigging LIBOR."[60]

54.     Also in August 2007, senior managers at Barclays instructed their USD LIBOR submitters to lower their USD LIBOR submissions so that they would stay "within the pack" and be nearer to the rates of other Panel Bank Defendants rather than rates that were consistent with the BBA's definition of LIBOR.[61] In one internal Barclays email, a Barclays employee noted that Lloyds' USD LIBOR submission was artificially low.[62] Similarly, in October 2007, a Barclays employee noted internally that an unidentified Contributor Bank submitted a LIBOR rate that was lower than the rate it actually paid.[63]

55.     Barclays' directive to stay "within the pack" with other Panel Bank Defendants remained in place, and was repeated, through at least 2009 and, on information and belief,

---

[59] Liam Vaughan & Gavin Finch, *Secret Libor Transcripts Expose Trader Rate-Manipulation*, Bloomberg, Dec. 13, 2012, http://www.bloomberg.com/news/print/2012-12-13/rigged-libor-with-police-nearby-shows-flaw-of-light-touch.html.

[60] *Id.*

[61] Barclays SOF ¶ 37.

[62] Email to Pat Leising (Aug. 28, 2007), BCI-H0000071-72, attached as Exhibit 7 and incorporated into this Complaint by reference.

[63] Email to Jason.Miu (Oct. 3, 2007), BARC-MAY6000086-87, attached as Exhibit 8 and incorporated into this Complaint by reference.

longer. Barclays has admitted that its USD LIBOR submissions were false because they were lower than Barclays would otherwise have submitted and contrary to the definition of LIBOR.[64]

56.     On November 29, 2007, a Barclays manager contacted a representative of BBA to advise that USD "LIBORs are being set lower than where they ought to be" and informed the BBA that this issue applied to all of the Panel Bank Defendants.[65] The Barclays manager explained that the Panel Bank Defendants were submitting rates that were too low because "banks are afraid to stick their heads above the parapet and post higher numbers because of what happened to [Barclays] when [Barclays] did. You get shot at."[66] The Barclays manager specifically identified certain other Panel Bank Defendants that were submitting LIBOR rates lower than where those banks could actually get funds.[67]

57.     On November 30, 2007, a private discussion occurred between a representative of Barclays and the FSA. An internal Barclays memorandum reveals that Barclays "didn't say anything along the lines of, you know, we're not posting where we think we should."[68] On December 4, 2007, a Barclays LIBOR submitter sent an internal email stating that the Panel Bank Defendants, including Barclays, were submitting false and dishonest submissions.[69]

58.     On March 5, 2008, the FSA asked Barclays what it was paying for funding in certain tenors and currencies.[70] A Barclays manager stated internally that s/he did not want to

---

[64] Barclays SOF ¶ 36.

[65] *Id.* ¶ 43.

[66] *Id.*

[67] *Id.*

[68] *Id.* ¶ 45.

[69] *Id.*

[70] *Id.* ¶ 46.

disclose that Barclays was borrowing USD "way over LIBOR" and would rather indicate that it was paying a rate equal to LIBOR.[71] A Barclays LIBOR submitter agreed that if s/he responded with "the honest truth" it might open a "can of worms."[72] Barclays responded to the FSA that it was paying for one-year USD at LIBOR "flat," which was untrue.[73]

59.     On April 11, 2008, a Barclays employee told an employee of the New York Federal Reserve that he was aware of Panel Bank Defendants putting in USD LIBOR submissions that were lower than what they were actually paying and that "the ones that need the cash most put in the lowest, lowest rates."[74] The Barclays employee said that Barclays could not borrow money at the rates submitted by other Panel Bank Defendants and that "if we can't borrow money at that rate, then no one else could really. . . . I mean we, you-you know we speak to everyone that everyone else does so, um, yeah, it's a quite, quite an uncomfortable feeling and I don't know if at some stage LIBORs will correct themselves."[75]

60.     On Wednesday, April 16, 2008, the *Wall Street Journal* published an article questioning the accuracy of LIBOR.[76] The article quotes Mr. Ewan as saying that the BBA is "closely watching the rates banks contribute" and that "[i]f it is deemed necessary, we will take

---

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] New York Federal Reserve Bank, Unofficial Transcript, ID09274211 (Apr. 11, 2008), at 7, *available at* http://www.newyorkfed.org/newsevents/news/markets/2012/libor/April_11_2008_transcript.pdf.

[75] *Id.* at 16.

[76] Carrick Mollenkamp, *Bankers Cast Doubt On Key Rate Amid Crisis*, Wall St. J., Apr. 16, 2008, http://online.wsj.com/article/SB120831164167818299.html.

action to preserve the reputation and standing in the market of our rates."[77] The article states that LIBOR was to be on the agenda of an upcoming BBA board meeting.[78]

61.     Over the next week, the BBA launched what its executives described as a "charm offensive,"[79] reaching out to investors and journalists to dispel concerns about LIBOR. For example, on April 17, 2008 the BBA publicly announced that it would expel any Contributor Bank that made deliberately inaccurate LIBOR submissions to create the false impression that the BBA did, and would, exercise meaningful oversight to ensure accurate and honest LIBOR submissions.[80] The BBA stated that it would fast-track an "intensive review" of its LIBOR process, but that it did not believe that Panel Bank Defendant had submitted false quotes.[81]

62.     On information and belief, the purpose of this "charm offensive" was not to address the fraud and collusion causing USD LIBOR suppression but rather to create the false impression that the Panel Bank Defendants provided accurate and honest USD LIBOR submissions. Consistent with this "charm offensive," several Panel Bank Defendants publicly provided pretextual explanations for the so-called dislocations in USD LIBOR. For example,

- On April 21, 2008, Jeffrey Rosenberg, head of credit strategy at Bank of America Securities, argued that the variations in LIBOR were simply a function of the way the BBA calculates LIBOR. He said the BBA

---

[77] *Id.*

[78] *Id.*

[79] Enrich & Colchester, *Before Scandal, Clash over Control of Libor, supra* note 7.

[80] UBS SOF ¶ 114.

[81] Carrick Mollenkamp & Laurence Norman, *British Bankers Group Sets Up Review of Widely Used Libor*, Wall St. J., Apr. 17, 2008, http://online.wsj.com/article/SB120838284713820833.html.

approach "works when both overall bank risk is low and the dispersion of risks across banks is small . . . [which] is clearly not the case currently."[82]

- On April 28, 2008, Dominic Konstam of Credit Suisse publicly defended LIBOR, stating that it "has been a barometer of the need for banks to raise capital.  The main problem with LIBOR is the capital strains facing banks."[83]

- On May 15, 2008, J.P. Morgan stated that LIBOR was "not broken" but that recent volatility could be attributed to "reluctance among banks to lend to each other amid the current credit crunch."[84]

These pretextual explanations and/or denials were false and intended to conceal the fact that the Panel Bank Defendants were fraudulently and collusively suppressing USD LIBOR.[85]

63.    During a six-month period in 2008, Thomson Reuters reportedly alerted Mr. Ewan on a weekly basis that the LIBOR process was being distorted.[86]  Mr. Ewan reportedly

---

[82] Gillian Tett & Michael Mackenzie, *Doubts Over Libor Widen*, Fin. Times, Apr. 21, 2008. That same article quotes unidentified "bankers" as saying it was "unlikely that this discrepancy has arisen because banks have deliberately been colluding to keep LIBOR rates down."

[83] Michael Mackenzie, *Talk of Quick Fix Recedes As Libor Gap Fails To Close*, Fin. Times, July 29, 2008, http://www.ft.com/intl/cms/s/0/3da27a46-5d05-11dd-8d38-000077b07658.html#axzz1szdS58jE.

[84] Kirsten Donovan, Jamie McGeever, Jennifer Ablan, Richard Leong & John Parry, *UPDATE 2-European, U.S. Bankers Work On Libor Problems*, Reuters, May 16, 2008, http://in.reuters.com/article/2008/05/16/markets-rates-bba-idINL162110020080516.

[85] As the FSA recently noted, the evidence of "dislocation did not in itself . . . carry any implication that "lowballing" was occurring.  Financial Services Authority Internal Audit Report ("FSA Internal Audit"), *A Review Of The Extent Of Awareness Within The FSA Of Inappropriate Libor Submissions, Management Response*, ¶ 1.5 (Mar. 2013), *available at* www.fsa.gov.uk/static/pubs/other/ia-libor-management-response.pdf.  Indeed, the *Wall Street Journal* article warned, "no specific evidence has emerged that banks have provided false information about borrowing rates."  Mollenkamp, *Bankers Cast Doubt On Key Rate Amid Crisis*, *supra* note 77.

[86] Ian Pollock, *Libor: BBA 'Warned Weekly' Says Former Rate-Compiler*, BBC News, July 25, 2012, http://www.bbc.co.uk/news/business-18930191.

told Thomson Reuters that he would investigate its concerns.[87]  On information and belief, he did not.

64.    On May 19, 2008, the FX & MM Committee met to discuss questions raised about LIBOR.  The meeting was "confidential" and the BBA refused to confirm the fact of the meeting.[88]  Senior bank executives described this gathering as a "working level pre meeting" to determine what should happen at the BBA's formal meeting scheduled for May 30, 2008.[89]  The Contributor Bank executives reportedly decided that they would make no substantive changes to the way LIBOR was calculated, but would instead embark on a campaign to alter perceptions that LIBOR was flawed.[90]

65.    On May 29, 2008, the *Wall Street Journal* published another article questioning USD LIBOR submissions made by Citigroup, WestLB, HBOS, J.P. Morgan, UBS, and other Panel Bank Defendants.[91]  Several Panel Bank Defendants disputed the *Wall Street Journal's* analysis.  The head of global fixed-income strategy at J.P. Morgan, for example, asserted that the *Wall Street Journal's* methodology was flawed because it was "based on too high a risk-free rate which produces a large upward bias in the Journal's measure of bank

---

[87] *Id.*

[88] Email from Angela Knight to Paul Tucker (May 21, 2008), attached as Exhibit 9 and incorporated into this Complaint by reference.  Barclays publicly disclosed the cover email but, apparently, not the attachment, which is said to provide the "blow-by-blow" account of what transpired at the May 19, 2008 meeting.

[89] Email from Paul Tucker (May 28, 2008), attached as Exhibit 10 and incorporated into this Complaint by reference.

[90] *Id.*

[91] Carrick Mollenkamp & Mark Whitehouse, *Study Casts Doubt on Key Rate*, Wall St. J., May 29, 2008, http://online.wsj.com/article/SB121200703762027135.html.

borrowing costs."[92] A Citigroup spokesman said "We continue to submit our LIBOR rates at levels that accurately reflect our perception of the market."[93] An HBOS spokesman said, "We believe our Libor fixings are a genuine and realistic indication of our average cost of funding. Our postings are on the whole in line with the market."[94] WestLB insisted that it provided accurate data.[95] These pretextual explanations and/or denials were false and intended to conceal the fact that the Panel Bank Defendants were fraudulently and collusively suppressing USD LIBOR.

66.     In another article published that same day, the BBA insisted, "We have every confidence in the integrity of the LIBOR-setting process and the accuracy of the figures it produces."[96] On information and belief, the BBA's statement was false because it knew that the Panel Bank Defendants had been submitting false and dishonest rates, and the BBA helped coordinate the agreement to suppress USD LIBOR.[97]

67.     After its formal meeting on May 30, 2008, the BBA announced that it would be strengthening the oversight of LIBOR and that "the details will be published in due course."[98]

---

[92] *Id.*

[93] John Parry, Dan Wilchins & Ed Tobin, *Banks May Be Understating Key Lending Rate: Report*, Reuters, May 29, 2008, http://www.reuters.com/article/2008/05/29/us-banks-libor-idUSN2930208320080529.

[94] *Id.*

[95] *Id.*

[96] Gavin Finch & Elliot Gotkine, *Libor Banks Misstated Rates, Bond at Barclays Says*, Bloomberg, May 29, 2008, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aMSoLbYpbHWk.

[97] *Id.* As with its April 2008 article, the *Wall Street Journal* cautioned that its analysis "doesn't prove that banks are lying or manipulating Libor." *Id.*

[98] *INTERNATIONAL: Libor Process*, N.Y. Times, May 30, 2008, http://www.nytimes.com/2008/06/06/news/06iht-6oxan-LIBOR.13532018.html (last visited Mar. 11, 2013).

The unidentified attendees at the May 30, 2008 BBA meeting signed confidentiality agreements limiting their ability to disclose what was discussed.[99]  In fact, on information and belief, Defendants intended only to make minor cosmetic changes to the LIBOR process.  The BBA shared its proposed changes with the Bank of England, which internally concluded that the BBA's proposal was "wholly inadequate."[100]  The FSA directed the BBA not to suggest that regulatory authorities endorsed the proposals.[101]

68.     On June 10, 2008, the BBA issued a press statement asserting that Contributor Banks "are invariably those with the best credit ratings and in the current diminished credit capacity of the market it is therefore not surprising that some institutions will not be able to access funds at the LIBOR rate."[102]  The BBA statement claimed that it was incorporating a tight scrutiny mechanism that would require any contribution discrepancies to be reviewed and justified.  In fact, on information and belief, the BBA's statement was false and Defendants did not intend to employ a tight scrutiny mechanism but, rather, intended to allow the Panel Bank Defendants to continue to fraudulently and collusively suppress USD LIBOR.

69.     On August 5, 2008, the BBA disclosed that Contributor Banks which had responded to the BBA's request for consultation were "confident" that their submitted rates were

---

[99] Email from Angela Knight to Paul Tucker (May 31, 2008), attached as Exhibit 11 and incorporated into this Complaint by reference.

[100] Transcript of Governor's written comments on email for Friday 30 May 2008 entitled Result of BBA review: just "strengthening the oversight of LIBOR," attached as Exhibit 12 and incorporated into this Complaint by reference.

[101] Email from Michael Cross (June 5, 2008), attached as Exhibit 13 and incorporated into this Complaint by reference.

[102] BBA, *Understanding the Construction and Operation Of BBA LIBOR – Strengthening for the Future, supra* note 24.

"truly reflective of their perceived borrowing costs."[103] On information and belief, by this statement Defendants further sought to falsely portray the LIBOR "dislocations" as the product of market forces and not fraud and collusion.

70. BBA officials later internally discussed the possibility of selling LIBOR or spinning it off into a wholly independent entity, but when BBA staffers pitched the idea to the Panel Bank Defendant executives, they reportedly got the impression that the Panel Bank Defendants—which paid much of the BBA's bills through their membership fees—wanted LIBOR kept in-house so that they could continue to influence it.[104] As a result, the idea ultimately was abandoned. The head of BBA, Angela Knight, was heard to argue with Mr. Ewan about LIBOR.[105] Ms. Knight reportedly wanted to scale back the BBA's role and took the position that LIBOR had become too big for her organization to manage.[106] Mr. Ewan, on the other hand, reportedly advocated further expansion, touting the revenue that the BBA generated from LIBOR.[107]

71. In September 2008, an internal UBS discussion confirmed that the Panel Bank Defendants were continuing to make artificially low LIBOR submissions. In a documented discussion, a UBS employee stated, "LIBORs currently are even more fictitious than usual."[108] On October 10, 2008, a Barclays employee privately reported to the New York Federal Reserve

---

[103] BBA, *LIBOR CONSULTATION FEEDBACK STATEMENT*, at ¶¶ 3.14, 3.19 (Aug. 5, 2008), *available at* www.bba.org.uk/download/7515.

[104] Enrich & Colchester, *Before Scandal, Clash over Control of Libor*, *supra* note 7.

[105] *Id.*

[106] *Id.*

[107] *Id.*

[108] UBS SOF ¶ 101.

Bank ("NY Fed") that its USD LIBOR submissions were "unrealistic."[109] On October 24, 2008, another Barclays employee privately reported to the NY Fed that USD LIBOR rates were "absolute rubbish,"[110] citing submissions by WestLB and Deutsche Bank as being too low. The employee told the NY Fed that he was aware of banks that were making LIBOR submissions that were below what they actually paid in comparable transactions.[111] Publicly, however, Barclays and other Panel Bank Defendants continued to falsely represent that LIBOR was based on accurate and honest submissions.

72.     The conspiracy to suppress LIBOR superseded the prior and ongoing efforts of individual traders to manipulate LIBOR to benefit their trading positions.[112] For example, UBS management on several occasions received requests made by individual traders to deviate slightly from the systematic suppression to manipulate a particular submission for Japanese Yen LIBOR on a given day.[113] On information and belief, those requests were rejected and/or did not prevent USD LIBOR suppression.

## IV.     HARMFUL EFFECTS OF THE UNLAWFUL CONDUCT

73.     Defendants' fraudulent and collusive conduct caused USD LIBOR to be published at rates that were false, dishonest, and artificially low.

---

[109] Unofficial Transcript of telephone call (Oct. 10, 2008), BARC-MAY6-000091-97, at 95, *available at* http://s3.documentcloud.org/documents/399152/new-york-fed-documents-on-barclays.pdf.

[110] Transcript of telephone call (Oct. 24, 2008), BARC-MAY6-000098-100, at 000098, 000100, *available at* http://s3.documentcloud.org/documents/399152/new-york-fed-documents-on-barclays.pdf.

[111] *Id.* at 000100.

[112] UBS SOF ¶¶ 132-133.

[113] *Id.*

74.     As shown in Figure 3 below, USD LIBOR was consistently a few basis points above the Eurodollar Bid Rate published by the Federal Reserve Board from 2002-2006. In fact, this close relationship existed back in time through 1992.[114] Eurodollars are time deposits in USD held in commercial banks outside the United States, primarily London. Eurodollar futures contracts, based on a notional $1 million three-month deposit, are traded on the Chicago Mercantile Exchange.[115] Prior to the contract settlement date, the price of a three-month Eurodollar futures contract is an indication of the market's prediction of the three-month USD LIBOR on its settlement date.[116] The Eurodollar bid rate can be seen to represent the interest rate at which a bank would lend money to another bank and the corollary of LIBOR, which can be seen as the "ask" rate.[117] As a result, an economist would expect to see a small bid (Eurodollar)/ask (LIBOR) spread as reflected in the relationship that existed from 1992 through 2006.[118] From 1992 through 2007, the Eurodollar Bid Rate reportedly predicted the following day's LIBOR rates better than the prior day's LIBOR rates.[119]

75.     The relationship between the Eurodollar Bid Rate and LIBOR fundamentally changed in the summer of 2007, with LIBOR rates falling below the Eurodollar Bid Rate, sometimes dramatically, through late 2011. These data confirm that the Panel Bank Defendants' behavior changed in 2007 with regard to USD LIBOR submissions at the same time that UBS,

---

[114] Federal Reserve Bank of San Francisco, *Ask Dr. Econ* (July 2006), http://www.frbsf.org/education/activities/drecon/2006/0607.html.

[115] Barclays SOF ¶ 9.

[116] *Id.*

[117] Connan Snider & Thomas Youle, *Does the LIBOR Reflect Banks' Borrowing Costs?*, at 3, 7 (Apr. 10, 2010), *available at* http://www.econ.umn.edu/~youle001/libor_4_01_10.pdf.

[118] *Id.*

[119] *Id.* at 8.

Barclays, RBS, and (on information and belief) other Panel Bank Defendants secretly adopted policies to suppress LIBOR and maintain submitted rates within a narrow range. From at least 2007 through at least May 2010, every one of the Panel Bank Defendants submitted USD LIBOR submissions that were significantly lower than the Eurodollar Bid Rate.

FIGURE 3: Difference between 3M USD LIBOR and 3M Eurodollar Bid Rate



76. On a Defendant-by-Defendant basis, the average USD LIBOR/Eurodollar Bid Rate spread during that time ranged from 25 basis points (BTMU, Barclays, Norinchukin) to 35 basis points (J.P. Morgan, WestLB).[120] Similarly, focusing only on the last two weeks of September 2008, the average USD LIBOR/Eurodollar Bid Rate spread ranged from 110 basis points (HBOS) to 153 basis points (J.P. Morgan), with the exception of Barclays (87 bp).[121]

---

[120] The remaining Panel Bank Defendants are: Bank of America (30 bp), Citigroup (32 bp), Credit Suisse (27 bp), Deutsche Bank (31 bp), HBOS (29 bp), HSBC (32 bp), Lloyds (30 bp), Rabobank (32 bp), RBC (26 bp), RBS (26 bp), and UBS (29 bp).

[121] The remaining Panel Bank Defendants are: BTMU (120 bp), Bank of America (144 bp), Citigroup (142 bp), Credit Suisse (122 bp), Deutsche Bank (129 bp), HSBC (141 bp), Lloyds (146), Norinchukin (126 bp), Rabobank (143 bp), RBC and RBS (140 bp), UBS (141 bp), and WestLB (138 bp).

77.     The individual participants in the fraudulent and collusive conduct described in this Complaint would not have engaged in the conduct, which carries the potential for criminal penalties, absent a reasonable belief that the conduct actually influenced the USD LIBOR fixings published by, and through, the BBA.

78.     By collusively suppressing USD LIBOR, Defendants raised the price of financial products tied to USD LIBOR (e.g. pay-fixed swaps and MBSs), limited consumer choice, and diminished the quality of financial products tied to USD LIBOR.  Defendants purport to compete in these financial product markets.  Further, to the extent that Defendants used false and dishonest USD LIBOR submissions to bolster their respective reputations, they artificially increased their ability to charge higher underwriting fees and obtain higher offering prices for financial products to the detriment of Freddie Mac and other consumers.

79.     Freddie Mac engaged in numerous financial transactions with Panel Bank Defendants and others involving products that incorporated USD LIBOR.  For example, Freddie Mac engaged in thousands of pay-fixed swaps and held billions of dollars in MBSs that paid monthly coupons tied directly to USD LIBOR.  Freddie Mac reasonably relied on the honesty of the affected benchmark rates in undertaking these transactions.  As a direct and proximate result of Defendants' unlawful conduct as described in this Complaint, and as will become clearer when information known only to Defendants is disclosed in discovery, Freddie Mac has been injured in its business and property and has suffered damages in an amount presently undetermined.

## DISCLOSURE OF THE FRAUDULENT AND COLLUSIVE CONDUCT

80.     On March 15, 2011, UBS disclosed in a note to its Annual Report that it had received subpoenas from the United States Commodity Futures Trading Commission ("CFTC")

and the DOJ in connection with investigations into LIBOR. This note marked the first public

acknowledgment by any Defendant of the confidential CFTC investigation, which began in late

2008.[122] The Annual Report stated that the investigations focused on whether there were

improper attempts by UBS, either acting on its own behalf or together with others, to manipulate

LIBOR rates.

      81.    Over the next several months, the Panel Bank Defendants, regulators, and

media reports gradually revealed the scope of the investigation.

- On March 16, 2011, the *Financial Times* reported that United States regulators subpoenaed UBS, Bank of America, Citigroup, and Barclays regarding USD LIBOR. *Bloomberg* reported that regulators had also contacted WestLB, Lloyds, and Deutsche Bank.

- A Competition Law Officer from the Canadian Competition Bureau submitted an affidavit in May 2011 in support of an ex parte application asking the Canadian courts to compel HSBC, RBS, Deutsche Bank, J.P. Morgan, and Citigroup to produce documents. The Canadian investigation relates to whether those banks conspired to "enhance unreasonably the price of interest rate derivatives from 2007 to March 11, 2010 . . . to prevent or lessen, unduly, competition in the purchase, sale, or supply of interest rate derivatives from 2007 to March 11, 2010, . . . to restrain or injure competition unduly from 2007 to March 11, 2010 . . . [and] to fix, maintain, increase or control the price for the supply of interest rate derivatives from March 12, 2010 to June 25, 2010."123

- In 2011, UBS secured conditional leniency from the DOJ for antitrust infringements related to Yen LIBOR and the Euroyen Tokyo Interbank Offered Rate ("TIBOR").

- On February 3, 2012, Credit Suisse disclosed that the Swiss Competition Commission had commenced an investigation involving 12 banks including Credit Suisse, and certain other financial intermediaries, concerning potential collusion among traders to affect and influence the bid-ask spread for derivatives tied to LIBOR.

---

[122] FSA Internal Audit, Communication 50, *supra* note 86.

[123] Affidavit of Brian Elliott (May 2011 Court of Ontario), ¶ 15.

- On February 14, 2012, *Bloomberg* reported that European Union antitrust regulators were investigating whether banks formed a cartel to manipulate interest rates.[124]

- In September 2012, sources reported that a former trader for RBS, Tan Chi Min, filed a 231-page affidavit with the Singapore High Court, which included contemporaneous messages authored during his tenure at RBS that reveal LIBOR fraud and collusion. In one message dated August 19, 2007, Mr. Tan wrote in an electronic discussion with traders at other banks, including Deutsche Bank's Mark Wong: "It's just amazing how Libor fixing can make you that much money or lose if opposite. It's a cartel now in London."[125]

**A.     Barclays Admissions**

82.     On June 26, 2012, Barclays entered into a non-prosecution agreement with the Criminal Fraud Division of the DOJ. As part of that agreement, Barclays agreed to a Statement of Facts that explains the basis of the non-prosecution agreement. Barclays further received conditional leniency from the DOJ's Antitrust Division for potential Sherman Act violations involving financial instruments that reference Euribor. Barclays also entered into a settlement with the CFTC to resolve charges that it violated Sections 6(c), 6(d), and 9(a)(2) of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 9, 13b, and 13(a)(2).[126]

83.     According to these filings, Barclays through its agents, officers, and employees repeatedly made false, misleading, or knowingly inaccurate submissions concerning USD LIBOR and other currencies. More specifically, Barclays admitted that by falsely representing that its LIBOR submissions were based on its perceived costs of borrowing unsecured funds in

---

[124] Lindsay Fortado & Joshua Gallu, *Libor Probe Said to Expose Collusion, Lack of Internal Controls*, Bloomberg, Feb. 14, 2012, http://www.bloomberg.com/news/2012-02-15/libor-investigation-said-to-expose-collusion-lack-of-internal-controls.html.

[125] Andrea Tan, Gavin Finch, & Liam Vaughan, *RBS Instant Messages Show Libor Rates Skewed for Traders*, Bloomberg, Sept. 26, 2012, http://www.bloomberg.com/news/2012-09-25/rbs-instant-messages-show-libor-rates-skewed-for-traders.html.

[126] Barclays CFTC Order, *supra* note 47.

the relevant interbank markets, it engaged in a deceptive course of conduct in an effort to gain an advantage over its counterparties and that Barclays' LIBOR submissions were false or misleading.[127] Barclays admitted that it lacked specific internal controls and procedures concerning its submission processes for LIBOR and that its inadequate supervision allowed the fraudulent and collusive conduct to occur. Barclays further admitted that it knew that the fraudulent and collusive suppression of affected interest rate derivatives tied to LIBOR benefited Barclays at the expense of its counterparties.[128]

84.     The BBA, which had known of the investigation since late 2008, publicly claimed to be "shocked" by Barclays' disclosures.[129] Just a few months earlier, the BBA deleted links on its website that detailed its involvement with setting LIBOR, including a statement that it "calculates and produces BBA LIBOR at the request of our members for the good of the market."[130]

**B.     UBS Admissions**

85.     On December 18, 2012, UBS entered into a non-prosecution agreement with the Criminal Fraud Division of DOJ. UBS also obtained conditional leniency for potential Sherman Act violations involving financial instruments that reference Yen LIBOR and Euroyen TIBOR.

---

[127] Barclays SOF ¶ 33.

[128] Barclays SOF ¶¶ 30-32.

[129] BBA, *Libor Statement – Thursday 28, June*, www.bba.org.uk/media/article/libor-statement (last visited Mar. 11, 2013).

[130] Liam Vaughan & Jesse Westbrook, *Libor Links Deleted as U.K. Bank Group Backs away from Rate*, Bloomberg, Mar. 7, 2012, http://www.businessweek.com/news/2012-03-06/libor-links-deleted-as-bank-group-backs-away-from-tarnished-rate#p2.

86.   On December 19, 2012, the Swiss Financial Market Supervisory Authority ("FINMA") issued a Summary Report regarding its investigation of UBS.[131]  The Final Notice summarizes UBS' misconduct and notes that UBS' "substantial failings in the system and control processes for LIBOR submissions" prevented those responsible at UBS from detecting and acting on the misconduct.[132]

87.   In December 2012, UBS Securities Japan Co., Ltd. ("UBSSJ") agreed to plead guilty to one count of wire fraud (18 U.S.C. § 1343)[133] for secretly manipulating Yen LIBOR and TIBOR.  UBSSJ admitted in its plea that false and misleading LIBOR submissions were "material" from the perspective of counterparties to financial transactions.[134]

88.   In December 2012, the DOJ charged two former UBS traders – Tom Alexander William Hayes, and Roger Darin (collectively, the "UBS traders") – with wire fraud and conspiracy to commit wire fraud for secretly manipulating LIBOR and other benchmark rates.[135]  In addition, the DOJ charged Messrs. Alexander and Hayes with a violation of Section 1 of the Sherman Act for conspiring with an unidentified employee at a major financial institution and others to fix Yen LIBOR, a key price component of Yen LIBOR-based derivative products.[136]

---

[131] *FINMA Investigation into the Submission of Interest Rates for the Calculation of Interest Reference Rates such as LIBOR by UBS AG*, at 2 (Dec. 19, 2012), attached as Exhibit 14 and incorporated into this Complaint by reference.

[132] *Id.*

[133] Letter from Denis J. McInerney, *supra*, note 25, Ex. 1, at Appendix B.

[134] *Id.* ¶¶ 9-10, 75.

[135] *United States of America v. Alexander, et al.*, Complaint, 12 MAG 3229 (Dec. 12, 2012), attached as Exhibit 15 and incorporated into this Complaint by reference.

[136] *Id.* (Count 3).

89.     On December 19, 2012, UBS and UBSSJ entered into a settlement with the

CFTC to resolve allegations that UBS violated Sections 6(c), 6(d), and 9(a)(2) of the CFTC, 7

U.S.C. §§ 9, 13b, and 13(a)(2).[137]  According to the CFTC's findings, from at least January 2005

through 2011, UBS by and through acts of dozens of employees, officers, and agents located

around the world, engaged in systematic misconduct that undermined the integrity of certain

global benchmarks, including USD LIBOR.  UBS admitted that its false submissions contained

market information that affected or tended to affect USD LIBOR, and USD LIBOR was a

commodity in interstate commerce.[138]  Further, UBS continued its "rampant misconduct,"

including collusive conduct, long after it was on notice (in October 2008) of an investigation into

its USD LIBOR practices.[139]

### C.      RBS Admissions

90.     On February 5, 2013, RBS executed a Deferred Prosecution Agreement with

the DOJ.  Under the terms of that agreement, RBS admitted various facts relating to its

involvement in fraudulent and collusive practices relating to LIBOR submissions.  The United

States filed a two-count criminal information charging RBS with wire fraud and price fixing in

connection with RBS' conduct and agreed to defer prosecution of that case pursuant to its

agreement with RBS.[140]  In addition, RBS Securities Japan Ltd. pleaded guilty to one count of

---

[137] *In the Matter of UBS AG and UBS Securities Japan Co., Ltd.*, CFTC Docket No. 13-09, Order
Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as
Amended, Making Findings and Imposing Remedial Sanctions (Dec. 19, 2012), attached as
Exhibit 16 and incorporated into this Complaint by reference.

[138] *Id.* at 4, 41, 52-53.

[139] *Id.* at 5.

[140] *Id.*

wire fraud for its participation in fraudulent and collusive practices relating primarily to BBA Yen LIBOR.[141]

91.    The agreements reached between (a) the United States and Barclays, (b) the United States and UBS, and (c) the United States and RBS all refer to an ongoing investigation into misconduct for additional benchmark rates. The United States has declined to reveal those benchmark rates. On information and belief, USD LIBOR is among the interest rates under investigation by the United States.

92.    Freddie Mac did not discover any of the fraud and collusion described in this Complaint until June 2012 when Barclays admitted that it knowingly and intentionally submitted false and dishonest LIBOR submissions to the BBA. Prior to that time, Freddie Mac was aware only that government regulators had initiated an investigation into LIBOR, that LIBOR "dislocations" were unusual and deviated from patterns predating the financial crisis but, as explained above, Defendants offered facially plausible pretextual explanations for these "dislocations" and repeatedly denied the existence of any fraudulent or collusive conduct relating to LIBOR submissions. In particular, the BBA held itself out as an independent entity that exercised meaningful oversight of LIBOR and on several occasions falsely represented that it had confirmed that LIBOR submissions were honest and accurate. Freddie Mac therefore did not know that the USD LIBOR fixings were false, made intentionally and knowingly, with intent to mislead, and/or pursuant to an agreement among Defendants.

93.    Freddie Mac did not have access to any of the information that could have revealed the fraud and collusion. For example, Freddie Mac did not have access to (a) the Panel Bank Defendants' actual costs of borrowing, (b) internal communications at the Panel Bank

---

[141] *Id.*

Defendants regarding fraud and collusion, (c) communications between and among the Panel

Defendant Banks regarding LIBOR, (d) communications between the Panel Defendant Banks

and government regulators, (e) documents produced in connection with the confidential

investigations; or (f) meetings of the FX & MM Committee.

94.     The admissions by Barclays and UBS provide some insight into the type of

efforts that the Panel Bank Defendants undertook to conceal their fraudulent and collusive

conduct. For example, (a) a UBS trader scolded a manager for internally transmitting in writing

a request to manipulate a LIBOR submission,[142] (b) a Barclays trader consciously sought to

move LIBOR submissions in small increments over time to avoid detection,[143] and (c) a UBS

derivatives desk manager instructed a LIBOR submitter to lie when interviewed by UBS

attorneys investigating LIBOR manipulation.[144] On information and belief, the other Panel Bank

Defendants engaged in similar conduct to cover up their fraudulent and collusive activities

involving USD LIBOR. The evidence of such conduct is solely within the custody and control

of the Panel Bank Defendants and/or government regulators.

95.     Several Defendants have asserted that they were unaware of the fraud and

collusion, or of any reason to suspect fraud and collusion, in LIBOR until shortly before the

Barclays disclosures in June 2012.

---

[142] UBS SOF ¶ 38.

[143] Barclays SOF ¶ 34.

[144] UBS SOF ¶ 35.

- The former CEO of Barclays, Bob Diamond, testified that he had no knowledge of any fraudulent or collusive conduct relating to LIBOR until shortly before he was presented with the FSA findings.[145]

- Four former UBS executives testified before Parliament that they had no knowledge of the alleged conduct or any reason at the time to suspect that Defendants were engaged in fraud and/or collusion with respect to LIBOR.[146]

- RBS claimed that it was unaware of the fraud and collusion until 2011, and continues to insist that there is no evidence of deliberate suppression of LIBOR.[147]

- The BBA claimed it was shocked by Barclay's admissions.

Consistent with these statements, the former head of the FSA, Adair Turner, told Parliament on February 26, 2013, that regulators could not have spotted the fraudulent and collusive conduct even with "intensive supervision."[148]

## COUNT I:  VIOLATIONS OF SHERMAN ACT SECTION 1 (ALL DEFENDANTS)

96.     Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

97.     In or about August 2007 and lasting through at least May 2010, Defendants formed a combination, conspiracy, or agreement to submit false USD LIBOR rates that were inconsistent with the public definition of LIBOR, below their actual borrowing costs, and within

---

[145] *Bob Diamond questioned by MPs on Barclays Libor scandal: as it happened*, The Telegraph (video) http://www.telegraph.co.uk/finance/newsbysector/banksandfinance/9374516/Bob-Diamond-questioned-by-MPs-on-Barclays-Libor-scandal-as-it-happened.html.

[146] *See, e.g.*, Mark Scott, *British Panel Castigates Ex-UBS Officials at Hearing*, N.Y. Times Dealbook, Jan.10, 2013, http://dealbook.nytimes.com/2013/01/10/former-ubs-executives-are-grilled-over-libor/.

[147] *RBS Reaches LIBOR Settlements* (Feb. 6, 2013), http://www.investors.rbs.com/news-item?item=1278540897095016.

[148] Huw Jones, *It Was Impossible To Spot Libor Rigging: UK Watchdog*, Feb. 27, 2013, http://www.reuters.com/article/2013/02/27/us-libor-britain-fsa-idUSBRE91Q0NX20130227.

a narrow range among the Panel Bank Defendants. Defendants had a conscious commitment to a common objective, namely suppressing USD LIBOR for the Panel Bank Defendants' short-term profit on transactions involving financial products that incorporated USD LIBOR and to maintain the Panel Bank Defendant's long-term viability.

98.    As set forth above, Defendants had strong motives to conspire. Because of the way that USD LIBOR is mathematically calculated, the number of participants in the unlawful agreement can directly affect the USD LIBOR fixing published by and through the BBA. In addition, the unlawful scheme required collective action to avoid detection. If any number of Panel Bank Defendants deviated from the agreement by submitting true and accurate USD LIBOR rates on a sustained basis, it ran the risk of exposing the unlawful scheme. Moreover, Panel Bank Defendants with good credit had a competitive advantage over less credit-worthy Panel Bank Defendants and it was not in the economic self-interest, absent a conspiracy of those Panel Bank Defendants with good credit to tolerate artificially low USD LIBOR submissions by the less credit-worthy banks.

99.    On information and belief, the Panel Bank Defendants knew the actual rates at which other Panel Bank Defendants could borrow funds and were in a position to know that the other Panel Bank Defendants' USD LIBOR submissions were lower than the rates at which those other Panel Bank Defendants believed they could borrow on the same terms. Similarly, because the BBA published each Panel Bank Defendants' LIBOR submissions, the Panel Bank Defendants could not cheat on their agreement to suppress USD LIBOR.

100.    Defendants had ample opportunity to conspire through, among other things, their FX & MM Committee meetings and numerous inter-bank communications. As shown above, on information and belief, the BBA joined in the unlawful agreement at the request of its

most important members and, to forestall the development of alternative benchmarks that could compete with LIBOR.

101.    In furtherance of the conspiracy, the BBA knowingly published false and dishonest USD LIBOR fixings. In furtherance of the conspiracy, several Panel Bank Defendants entered into financial contracts tied to USD LIBOR with Freddie Mac and made underpayments to Freddie Mac based on the artificially suppressed USD LIBOR fixings.

102.    The Panel Bank Defendants cannot credibly claim that they all unilaterally and simultaneously began systematically providing fraudulent and artificially low USD LIBOR submissions at or around the same time in August 2007, in light of the evidence publicly disclosed by Barclays and UBS revealing that each implemented similar internal directives to suppress LIBOR at that time, and RBS' reported admission in August 2007 that it knew Panel Banks were systematically manipulating USD LIBOR. Because the BBA's instructions prohibit Contributor Banks from basing their USD LIBOR submissions on submissions by other Contributor Banks, the Panel Bank Defendants cannot claim that their conduct was merely the result of conscious parallelism. Defendants' pretextual explanations for the artificially low USD LIBOR submissions further expose the fact of Defendants' unlawful agreement.

103.    The purpose and/or effect of Defendants' unlawful agreement was to suppress USD LIBOR, an element of price in numerous financial products including, but not limited to, pay-fixed swaps, mortgages, and MBSs, to the benefit of the Panel Bank Defendants and to the detriment of Freddie Mac and other counterparties. Defendants knew, or should have known, that their agreement to suppress USD LIBOR would affect the prices and returns on financial products tied to USD LIBOR.

104.     The antitrust charges filed against subsidiaries of UBS and RBS confirm that agreements to manipulate LIBOR constitute *per se* restraints of trade in violation of Sherman Act Section 1.

105.     As a result of Defendants' fraudulent and collusive conduct, Freddie Mac suffered damages from the artificial suppression of LIBOR in the form of, among other things, lower interest payments on financial products that incorporate LIBOR.

## COUNT II:  BREACH OF CONTRACT (DEFENDANT BANK OF AMERICA)

106.     Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

107.     On March 8, 1999, Freddie Mac entered into an ISDA Master Agreement with NationsBank, N.A., predecessor-in-interest to Bank of America, under which Freddie Mac entered into pay-fixed swaps with Bank of America ("BOA Master Agreement").[149]  In the BOA Master Agreement, the parties represented that the execution, delivery, and performance of the BOA Master Agreement did not violate or conflict with any law applicable to it.  ¶ 3(a)(iii).  The BOA Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."  ¶ 3(d).  The BOA Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the BOA Master Agreement or any Credit Support Document to which it is a party.  ¶ 4(c).

---

[149] The BOA Master Agreement is attached as Exhibit 17 and incorporated into this Complaint by reference.

108.    The BOA Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated. ¶ 5(a)(iv). The BOA Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the BOA Master Agreement. ¶ 11.

109.    The BOA Master Agreement states that all transactions between Freddie Mac and Bank of America are entered into in reliance on the fact that the BOA Master Agreement and all confirmations form a single agreement between the parties. ¶ 1(c). A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

110.    During the relevant period, Freddie Mac entered into more than 150 pay-fixed swaps governed by the BOA Master Agreement.

111.    Bank of America knowingly breached and defaulted on the BOA Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD LIBOR, and its underpayments to Freddie Mac tied to the artificially suppressed USD LIBOR.

112.    As a result of Bank of America's breach of the BOA Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the BOA Master Agreement.

## COUNT III:  BREACH OF CONTRACT (DEFENDANT BARCLAYS)

113.    Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

114.    On January 2, 1996, Freddie Mac entered into an ISDA Master Agreement with Barclays ("Barclays Master Agreement").[150]  In the Barclays Master Agreement, the parties represented that the execution, delivery, and performance of the Barclays Master Agreement did not violate or conflict with any law applicable to it.  ¶ 3(a)(iii).  The Barclays Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."  ¶ 3(d).  The Barclays Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Barclays Master Agreement or any Credit Support Document to which it is a party.  ¶ 4(c).

115.    The Barclays Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.  ¶ 5(a)(iv).  The Barclays Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Barclays Master Agreement.  ¶ 11.

116.    The Barclays Master Agreement states that all transactions between Freddie Mac and Barclays are entered into in reliance on the fact that the Barclays Master Agreement and

---

[150] The Barclays Master Agreement is attached as Exhibit 18 and incorporated into this Complaint by reference.

all confirmations form a single agreement between the parties. ¶ 1(c). A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

117.   During the relevant period, Freddie Mac entered into more than 100 pay-fixed swaps governed by the Barclays Master Agreement.

118.   Barclays breached and defaulted on the Barclays Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD LIBOR, and its underpayments to Freddie Mac tied to the artificially suppressed USD LIBOR.

119.   As a result of Barclays' breach of the Barclays Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the Barclays Master Agreement.

## COUNT IV:  BREACH OF CONTRACT (DEFENDANT CITIBANK, N.A.)

120.   Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

121.   On January 21, 1993, Freddie Mac entered into an ISDA Master Agreement with Defendant Citibank, N.A. The parties renewed the ISDA Master Agreement on April 1, 1994 ("Citibank Master Agreement").[151] In the Citibank Master Agreement, the parties each represented that the execution, delivery, and performance of the Citibank Master Agreement did not violate or conflict with any law applicable to it. ¶ 3(a)(iii). The Citibank Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a

---

[151] The Citibank Master Agreement is attached as Exhibit 19 and incorporated into this Complaint by reference.

party] to the other party [is] true, accurate and complete in every material respect." ¶ 3(d).  The Citibank Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Agreement or any Credit Support Document to which it is a party.  ¶ 4(c).

122.    The Citibank Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.  ¶ 5(a)(iv).  The Citibank Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Citibank Master Agreement.  ¶ 11.

123.    The Citibank Master Agreement states that all transactions between Freddie Mac and Citibank are entered into in reliance on the fact that the Citibank Master Agreement and all confirmations form a single agreement between the parties.  ¶ 1(c).  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

124.    During the relevant period, Freddie Mac entered into more than 90 pay-fixed swaps governed by the Citibank Master Agreement.

125.    Citibank breached and defaulted on the Citibank Master Agreement through Citigroup's fraudulent and collusive conduct, Citigroup's failure to disclose the fraudulent and collusive conduct, Citigroup's intentional misrepresentation and manipulation of USD LIBOR, and Citibank's underpayments to Freddie Mac tied to the artificially suppressed USD LIBOR.

126.    As a result of Citigroup's breach of the Citibank Master Agreement, Freddie

Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees,

to enforce and protect Freddie Mac's rights under the Citibank Master Agreement.

**COUNT V:  BREACH OF CONTRACT (DEFENDANT CREDIT SUISSE)**

127.    Freddie Mac incorporates by reference the preceding paragraphs of this

Complaint.

128.    On August 23, 2002, Freddie Mac entered into an ISDA Master Agreement

with Credit Suisse First Boston International, predecessor-in-interest to Credit Suisse, under

which Freddie Mac entered into pay-fixed swaps with Credit Suisse ("Credit Suisse Master

Agreement").[152]  In the Credit Suisse Master Agreement, the parties represented that the

execution, delivery, and performance of the Credit Suisse Master Agreement did not violate or

conflict with any law applicable to it.  ¶ 3(a)(iii).  The Credit Suisse Master Agreement further

states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to

the other party [is] true, accurate and complete in every material respect."  ¶ 3(d).  The Credit

Suisse Master Agreement requires that the parties comply in all material respects with all

applicable laws and orders to which a party may be subject if failure so to comply would

materially impair its ability to perform its obligations under the Credit Suisse Master Agreement

or any Credit Support Document to which it is a party.  ¶ 4(c).

129.    The Credit Suisse Master Agreement provides that a party defaults any time

that it makes or repeats a representation that proves to be incorrect or misleading in any material

respect when made or repeated.  ¶ 5(a)(iv).  The Credit Suisse Master Agreement provides that a

---

[152] The Credit Suisse Master Agreement is attached as Exhibit 20 and incorporated into this
Complaint by reference.

defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Credit Suisse Master Agreement. ¶ 11.

130.   The Credit Suisse Master Agreement states that all transactions between Freddie Mac and Credit Suisse are entered into in reliance on the fact that the Credit Suisse Master Agreement and all confirmations form a single agreement between the parties. ¶ 1(c). A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

131.   During the relevant period, Freddie Mac entered into more than 200 pay-fixed swaps governed by the Credit Suisse Master Agreement.

132.   Defendant Credit Suisse breached and defaulted on the Credit Suisse Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD LIBOR, and its underpayments to Freddie Mac tied to the artificially suppressed USD LIBOR.

133.   As a result of Credit Suisse's breach of the Credit Suisse Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the Credit Suisse Master Agreement.

## COUNT VI:  BREACH OF CONTRACT (DEFENDANT DEUTSCHE BANK)

134.   Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

135.     On April 10, 1997, Freddie Mac entered into an ISDA Master Agreement with Deutsche Bank ("Deutsche Bank Master Agreement").[153]  In the Deutsche Bank Master Agreement, the parties represented that the execution, delivery, and performance of the Deutsche Bank Master Agreement did not violate or conflict with any law applicable to it.  ¶ 3(a)(iii).  The Deutsche Bank Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."  ¶ 3(d).  The Deutsche Bank Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the Deutsche Bank Master Agreement or any Credit Support Document to which it is a party.  ¶ 4(c).

136.     The Deutsche Bank Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.  ¶ 5(a)(iv).  The Deutsche Bank Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the Deutsche Bank Master Agreement.  ¶ 11.

137.     The Deutsche Bank Master Agreement states that all transactions between Freddie Mac and Defendant Deutsche Bank are entered into in reliance on the fact that the Deutsche Bank Master Agreement and all confirmations form a single agreement between the

---

[153] The Deutsche Bank Master Agreement is attached as Exhibit 21 and incorporated into this Complaint by reference.

parties. ¶ 1(c). A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

138.    During the relevant period, Freddie Mac entered into more than 300 pay-fixed swaps governed by the Deutsche Bank Master Agreement.

139.    Deutsche Bank breached and defaulted on the Deutsche Bank Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD LIBOR, and its underpayments to Freddie Mac tied to the artificially suppressed USD LIBOR.

140.    As a result of Defendant Deutsche Bank's breach of the Deutsche Bank Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the Deutsche Bank Master Agreement.

## COUNT VII:  BREACH OF CONTRACT (DEFENDANT HSBC)

141.    Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

142.    On October 25, 2001, Freddie Mac entered into an ISDA Master Agreement with HSBC Bank USA under which Freddie Mac entered into pay-fixed swaps with HSBC ("HSBC Master Agreement").[154]  In the HSBC Master Agreement, the parties represented that the execution, delivery, and performance of the HSBC Master Agreement did not violate or conflict with any law applicable to it. ¶ 3(a)(iii). The HSBC Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the

---

[154] The HSBC Master Agreement is attached as Exhibit 22 and incorporated into this Complaint by reference.

other party [is] true, accurate and complete in every material respect." ¶ 3(d). The HSBC

Master Agreement requires that the parties comply in all material respects with all applicable

laws and orders to which a party may be subject if failure so to comply would materially impair a

party's ability to perform its obligations under the HSBC Master Agreement or any Credit

Support Document to which it is a party. ¶ 4(c).

143.    The HSBC Master Agreement provides that a party defaults any time that it

makes or repeats a representation that proves to be incorrect or misleading in any material

respect when made or repeated. ¶ 5(a)(iv). The HSBC Master Agreement provides that a

defaulting party will, on demand, indemnify and hold harmless the other party for and against all

reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason

of the enforcement and protection of its rights under the HSBC Master Agreement. ¶ 11.

144.    The HSBC Master Agreement states that all transactions between Freddie Mac

and HSBC are entered into in reliance on the fact that the HSBC Master Agreement and all

confirmations form a single agreement between the parties. ¶ 1(c). A "confirmation" is defined

in the first paragraph as the documents and other confirming evidence exchanged between the

parties for each transaction.

145.    During the relevant period, Freddie Mac entered into more than 20 pay-fixed

swaps governed by the HSBC Master Agreement.

146.    HSBC breached and defaulted on the HSBC Master Agreement through its

fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its

intentional misrepresentation and manipulation of USD LIBOR, and its underpayments to

Freddie Mac tied to the artificially suppressed USD LIBOR.

147.    As a result of HSBC's breach of the HSBC Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the HSBC Master Agreement.

## COUNT VIII:  BREACH OF CONTRACT (DEFENDANT RBS)

148.    Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

149.    On April 7, 2006, Freddie Mac entered into an ISDA Master Agreement with RBS ("RBS Master Agreement").[155]  In the RBS Master Agreement, the parties represented that the execution, delivery, and performance of the RBS Master Agreement did not violate or conflict with any law applicable to it.  ¶ 3(a)(iii).  The RBS Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect."  ¶ 3(d).  The RBS Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the RBS Master Agreement or any Credit Support Document to which it is a party.  ¶ 4(c).

150.    The RBS Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.  ¶ 5(a)(iv).  The RBS Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all

---

[155] The RBS Master Agreement is attached as Exhibit 23 and incorporated into this Complaint by reference.

reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the RBS Master Agreement. ¶ 11.

151.    The RBS Master Agreement states that all transactions between Freddie Mac and RBS are entered into in reliance on the fact that the RBS Master Agreement and all confirmations form a single agreement between the parties. ¶ 1(c). A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

152.    During the relevant period, Freddie Mac entered into some 200 pay-fixed swaps governed by the RBS Master Agreement.

153.    RBS breached and defaulted on the RBS Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD LIBOR, and its underpayments to Freddie Mac tied to the artificially suppressed USD LIBOR.

154.    As a result of RBS' breach of the RBS Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the RBS Master Agreement.

## COUNT IX:  BREACH OF CONTRACT (DEFENDANT UBS)

155.    Freddie Mac incorporates by reference the preceding paragraphs of this Complaint.

156.    On May 1, 1996, Freddie Mac entered into an ISDA Master Agreement with Swiss Bank Corporation, predecessor-in-interest to UBS, under which Freddie Mac entered into

pay-fixed swaps with UBS ("UBS Master Agreement").[156]  In the UBS Master Agreement, the parties represented that the execution, delivery, and performance of the UBS Master Agreement did not violate or conflict with any law applicable to it.  ¶ 3(a)(iii).  The UBS Master Agreement further states that "[a]ll applicable information that is furnished in writing by or on behalf of [a party] to the other party [is] true, accurate and complete in every material respect." ¶ 3(d). The UBS Master Agreement requires that the parties comply in all material respects with all applicable laws and orders to which a party may be subject if failure so to comply would materially impair its ability to perform its obligations under the UBS Master Agreement or any Credit Support Document to which it is a party.  ¶ 4(c).

157.    The UBS Master Agreement provides that a party defaults any time that it makes or repeats a representation that proves to be incorrect or misleading in any material respect when made or repeated.  ¶ 5(a)(iv).  The UBS Master Agreement provides that a defaulting party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under the UBS Master Agreement.  ¶ 11.

158.    The UBS Master Agreement states that all transactions between Freddie Mac and UBS are entered into in reliance on the fact that the UBS Master Agreement and all confirmations form a single agreement between the parties.  ¶ 1(c).  A "confirmation" is defined in the first paragraph as the documents and other confirming evidence exchanged between the parties for each transaction.

---

[156] The UBS Master Agreement is attached as Exhibit 24 and incorporated into this Complaint by reference.

159.   During the relevant period, Freddie Mac entered into more than 200 pay-fixed swaps governed by the UBS Master Agreement.

160.   UBS breached and defaulted on the UBS Master Agreement through its fraudulent and collusive conduct, its failure to disclose fraudulent and collusive conduct, its intentional misrepresentation and manipulation of USD LIBOR, and its underpayments to Freddie Mac tied to the artificially suppressed USD LIBOR.

161.   As a result of UBS' breach of the UBS Master Agreement, Freddie Mac has suffered damages and incurred reasonable out-of-pocket expenses, including legal fees, to enforce and protect Freddie Mac's rights under the UBS Master Agreement.

## COUNT X:  FRAUD (ALL DEFENDANTS)

162.   Freddie Mac incorporates by reference the preceding paragraphs in this Complaint.

163.   Each Defendant owed a duty to Freddie Mac to honestly and accurately report USD LIBOR and not to intentionally mislead Freddie Mac and others by secretly and collectively manipulating USD LIBOR for their gain and to the detriment of others in the financial markets.

164.   As described above, beginning in August 2007 and continuing through at least May 2010, each Panel Bank Defendant falsely represented on a daily basis the following:

- Its USD LIBOR submissions were consistent with the published definition of LIBOR.

- It based its USD LIBOR submissions on its honest perception of its cost of funds in the London interbank market without reference to rates submitted by other Panel Bank Defendants.

- Its USD LIBOR submissions represented the actual rates at which it honestly believed another bank would offer it funds in the London interbank market.

165.    The Panel Bank Defendants made these representations knowing that they were false, or with reckless disregard for their truth, intending for Freddie Mac and others to rely on them, to influence the USD LIBOR fixing to their benefit, and to conceal their ongoing fraud and collusion.

166.    In addition, all Defendants, including the BBA, falsely represented the following material facts.

- USD LIBOR rates electronically communicated by, and through, the BBA were based on honest submissions by the Panel Bank Defendants that were consistent with the published definition of LIBOR.

- The BBA conducted a full investigation in 2008 into LIBOR submissions by the Panel Bank Defendants and confirmed that the USD LIBOR submissions were honest and consistent with the published definition of LIBOR.

- The BBA actively monitored the Panel Bank Defendants' submissions to ensure that they were consistent with the published definition of LIBOR.

167.    Defendants made these misrepresentations knowing that they were false, or with reckless disregard for their truth, intending for Freddie Mac and others to rely on them, in entering into financial transactions tied to USD LIBOR.

168.    In addition, beginning in mid-2008, as described in this Complaint, certain Defendants falsely represented to Freddie Mac and others that deviations in LIBOR from other benchmark rates were the result of market forces alone and not intentional manipulation by the Panel Bank Defendants.  These Defendants made these false representations  and pretextual explanations knowing that they were false, or with reckless disregard for their truth, in furtherance of the alleged conspiracy, to avoid detection and to perpetuate the fraudulent and collusive conduct described in this Complaint.

169.     Freddie Mac reasonably relied on Defendants' misrepresentations in entering into financial transactions incorporating USD LIBOR.

170.     As a result of Freddie Mac's reasonable reliance and Defendants' fraud, Freddie Mac suffered damages in the form of, among other things, lower interest rate payments from Defendants and others from financial products that incorporated LIBOR.

## COUNT XI:  TORTIOUS INTERFERENCE WITH CONTRACT (ALL DEFENDANTS)

171.     Freddie Mac incorporates by reference the preceding paragraphs in this Complaint.

172.     Freddie Mac purchased MBSs, entered into pay-fixed swaps, and entered into other financial contracts tied to USD LIBOR with counterparties other than Defendants.

173.     Defendants knew, or should have known, that Freddie Mac had purchased MBSs and entered into financial instruments that incorporated USD LIBOR.

174.     Defendants intentionally interfered with these contracts and agreements, as described above, and caused Freddie Mac to receive reduced payments from those contracts and/or a decrease in value.

175.     As a result of Defendants' intentional interference with Freddie Mac's contracts and agreements, Freddie Mac suffered damages in the form of, among other things, receiving lower interest rate payments from Defendants and others.

## PRAYER FOR RELIEF

WHEREFORE, Freddie Mac requests the Court to:

a.  Enter judgment for Freddie Mac awarding Freddie Mac its full damages for all economic, monetary, actual, consequential, and compensatory damages that Freddie Mac suffered as a result of Defendants' unlawful and/or inequitable conduct.

b.  Award punitive damages to the extent allowable by law.

c.  Treble damages for violations of the Sherman Act.

d.  Award attorneys' fees and costs of suit.

e.  Grant such other further relief as allowed by law.

## JURY DEMAND

Freddie Mac requests a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure.

Dated:  March 14, 2013

Jay N. Fastow
DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, NY  10019
212-277-6500

Respectfully submitted,

DICKSTEIN SHAPIRO LLP

By: _____
    Richard J. Leveridge
    James R. Martin
    Jennifer D. Hackett
    Aja P. Sae-Kung (VA Bar #79014)
    Lisa M. Kaas (VA Bar # 68290)
    1825 I Street, NW
    Washington, DC  20006
    202-420-2200

*Attorneys for Plaintiff Federal Home Loan Mortgage Corporation*